IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW JASON BEDDINGFIELD | Case No: 22-cr-00066-CJN |

**SUPPLEMENTAL RESPONSE TO THE GOVERNMENT'S MOTION FOR DETENTION**

**I.   INTRODUCTION**

On March 4, 2021, Matthew Beddingfield was before this court for his Preliminary hearing and Detention hearing. The court moved forward with the Detention hearing only. The government indicated a Grand Jury returned an Indictment against Matthew earlier that morning. On March 7, 2022, undersigned counsel received notification via CM/ECF of the filed Indictment.

On March 4, 2022, this court heard arguments from both sides. Matthew Beddingfield is requesting full enforcement of his Constitutional rights, namely his presumption of innocence, a release decision free of unconstitutional bias based on protected Free Speech, and that the government be prevented from regurgitating proffered facts related to a prior conviction subject to an *Alford Plea*. Matthew maintains that using proffered facts by the State and Federal prosecutor violates Matthew's Due Process rights. He never admitted to the facts or the investigatory materials relied on by the AUSA. The sole purpose of a proffer for an *Alford Plea* is to ensure the State Court Judge could make a factual basis to accept the plea. Those proffered facts were then (and aren't now) agreed to by Matthew. As the Supreme Court indicated in *Alford*, this process, is fully within Matthew's rights. We also argued Matthew does not pose a "serious risk of flight".

1

When the government's dangerousness arguments are cast in their appropriate light, a release order is mandated because there are several conditions, a combination of which, satisfy 18 U.S.C. 3142(f).  This court can't detain Matthew because of some conclusion that Matthew is dangerous because of political speech, literature, or free speech posted on social media.  Equally unavailing is an unreasonable enhanced view of Matthew's alleged dangerousness because he has a prior conviction.  The North Carolina State court released Matthew on that charge pre-trial and post-conviction.  The State's judgment of Matthew should encourage this court to release, not re-litigate.  The elements of the charge, not the disputed facts, are the factors this court can consider now.  Even after considering that conviction and his driving offense, there are conditions that disable concerns about future actions while released.  Matthew can be ordered to prevent or limit his driving.  As explained below, a violent act while on pre-trial release is rare.  The rare occasion is considerably curtailed by all the Standard conditions traditionally imposed upon release.  As indicated in the March 4, 2022 detention release arguments, Federal Pre-trial Services has mechanisms to enforce conditions of release that don't appear to have been utilized in his State court supervision.

## II.     SUPPLEMENTAL ARGUMENTS RELATED TO THE COURT'S CONCERNS

### A. It is an Error to Rely on Ordinary Risk of Flight as a Justification for Detention When the Data Does Not Support a Likelihood Matthew will Flee

After briefing and initial detention arguments, it does not appear the government is arguing Matthew is a serious flight risk.  For this court's findings, he is not. Detaining Matthew on the myth of serious flight risk actually undermines long-term community safety and his personal health.  The Administrative Office of US Courts keeps data on various criminal court issues including detention, release, and "fugitive" rates (previously captured as "Failures To Appear" after pretrial release).  This data shows that only 1.4% of clients on

pretrial release fail to appear.[1] Despite the reality that flight is a very low probability for most defendants, flight risk is cited as one of the justifications for detaining Matthew in the D.C. Pre-trial Services Report. *See Dkt. 8, pp. 1 (*Pre-trial Report). Matthew's Pre-trial report also indicates he has, no "escape or bench warrant history". *Id.*at pp. 3. He has substantial community ties, and a good Third-party custodian. The evidence does not support a finding that Matthew is a serious flight risk.

### B. Matthews Perceived Dangerousness Does Not Rise to the Requisite "Clear and Convincing Evidence" Standard the Supreme Court Set.

#### 1. Prior Impressions of Matthew's home environment negatively impacted his perceived risk of 'danger to the community'.

Since Matthew's first court appearance in Raleigh, NC on February 9, 2022, his mother was not considered a suitable Third-Party Custodian. This appears in part due to the guns found in the family home, 2000 rounds of ammunition alleged to have been discovered in Matthew's room, and his father's decision to take his son to political rallies while on pre-trial bond from State court. We are not requesting Matthew return home, we have proposed his Grandfather.

##### a. The Government is Mistaken about the Amount of Ammunition, the Location, and the Way it was Discovered in the Beddingfield Home.

At the March 4, 2022 hearing, the government admitted the ammunition alleged to have been found in Matthew's room was mistakenly characterized. The day of the hearing, the government submitted another search warrant (not received by the parents) reportedly with guns and ammunition found at the home but the government maintained ammunition was found in Matthew's bedroom. At the March 4, 2022 hearing, the government explained that law enforcement whom executed the search warrant had to go back and that's when ammunition was

---

[1] Table H-13. U.S. District Courts—Pretrial Services Cases Closed, by Type of Disposition, For the 12- Month Period Ending September 30, 2019. ttps://www.uscourts.gov/sites/default/files/data_tables/jb_h13_0930.2019.pdf.

3

found in Matthew's room. This too is an error. Law enforcement only searched the Beddingfield residence one time. They did not go back on separate occasions. The same day that they executed the search warrant (Docket Entry 11, Exhibit 2) law enforcement called Mr. & Mrs. Beddingfield shortly afterward. The officer indicated they forgot <u>all</u> the ammunition on the parent's bed in their bedroom. The officer told the father that after leaving their home, they could not re-enter the home and continue searching. The officer gave the father the choice to either give the ammunition to them voluntarily or they would seek an additional search warrant. Matthew's father and mother cooperated with law enforcement and looked for any items the officers left behind. Matthew's parents gave law enforcement the ammunition the government has argued was in Matthew's room. Neither law enforcement nor the government can accurately represent the location of the additional items memorialized in the second search warrant inventory because law enforcement never searched the house a subsequent time. They did not observe where the parents got the items law enforcement requested.

    The government also argued that Matthew's mother did not know where the guns were. This too is incorrect. Matthew's mother was on the line and watching the March 4, 2022 detention hearing. Afterward she indicated this representation by the government was wrong. When law enforcement first executed the search warrant at the Beddingfield home, the mother was not there—at first. His father and their adult daughter were there when law enforcement arrived. When the government indicated the mother didn't know where her firearms were, we believe the government is confusing the mother with the daughter whom law enforcement first encountered with the father. While the search warrant was being executed, the mother arrived. She was there until the search concluded and she signed the search warrant receipt. Docket Entry 11, Exhibit 2.

It sounds like the parents were cooperative with law enforcement and provided substantial assistance to clear their home of guns and ammunition.

### 2. Data Based on Pre-Trial Releases Shows Defendants Rarely Flee or Recidivate While on Conditions

The court indicated that counsel had a level of confidence in USPO Pre-trial that perhaps they do not have in themselves. Counsel maintains a high level of confidence in the personnel, technology, resources, and community partnerships available to USPO Pre-trial services in this jurisdiction. Although there are many Standard and Special Conditions for Pretrial services to utilizes, the actual number is not quantifiable because one the conditions allows Judges to order all conditions justified. It is hard for the government to meet its burden that nothing will work, because a combination of resources and conditions is so rich with effective conditions. Most Defendants on pretrial release only an average of 8.5 conditions imposed.[2] Defendants whom are released on presumption cases average 11 conditions.[3]

It is well known that Pretrial Services uses a Pre-trial Risk Assessment Tool (PTRA) to inform release recommendations. The PTRA algorithm is based on a black box algorithm (limits pubic transparency) of group data that asserts to predict future individual behavior. Although there has been rigorous debate about the PTRA's efficacy, one of the relevant critiques here is that the PTRA does not assess risk <u>with conditions imposed</u>. Once conditions are imposed, the data is clear that defendants on Pretrial release rarely flee or recidivate.[4] This chart illustrates the data:

---

[2] Amaryllis Austin, *The Presumption for Detention Statute's Relationship to Release Rates*, 81(2) FED. PROBATION 52, 53 (2017), https://www.uscourts.gov/federal-probationjournal at pp. 57 at Table 3.
[3] *Id.*
[4] Alison Siegler Truth-in-Testimony Form at 4–10, *The Administration of Bail by State and Federal Courts: A Call for Reform*, Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. (Nov. 14, 2019), https://docs.house.gov/meetings/JU/JU08/20191114/110194/HHRG-116-JU08-TTF-SieglerA-20191114.pdf at pp. 8.



### 3. Matthew Was Not Engaged in the Most Serious Conduct Alleged at the Capitol on January 6, 2021 and He Should Be Released.

On March 4, 2022, the government played several exhibits (1-15) to illustrate Matthew's dangerousness that day. Even when there was audio associated with his actions, you could hear the many other people swearing and inciting violence—some using bullhorns. The Audio and still pictures do not depict a young man carrying out anything close to the most aggressive acts. During the argument I referenced a picture that was not shown of Matthew washing his eyes out. That image can be found in the Complaint. Docket Entry 1, pp. 21.

I also argued that this court can't find that Matt will engage in future acts of violence based on his viewpoints. I pointed to the November 14, 2020 "Maga Rally" where he also had a flag pole and attended peacefully despite the presence of counter protestors. Those images are also reflected in the Complaint. *Id.* at pp. 6-8, images 5 & 6 therein. We encourage the court to scroll through the images depicted in the Complaint for a broader view of some of Matthew's calm demeanor while at the Capitol.

    **4. Matthew's Prior Performance on State Bail and Probation Conditions Can't Be Accurately Compared to the Resources and Enforcement Mechanisms That Will Be Carried Out by Federal Pre-Trial Services.**

On March 4, 2022, we referenced the Supreme Court's decision in *Roper v. Simmons* to remind this court that young people (under age 25) are in the last phase of significant neurological brain development. *Roper v. Simmons*, 543 U.S. 551 (2005). Developmental psychologists consistently report differences between the thinking and behavior of children, adolescents and adults. Neuroscience research suggests that these behaviors reflect more fundamental dissimilitude in brain development, biological maturation, and intellectual functioning."[5] In other words, "a 'hard-science' explanation may exist for the 'soft-science' observations of social scientists." *Id*. Throughout childhood and into the mid-twenties, the pre-frontal cortex of the frontal lobe completes a transition from gray to white matter. *See e.g.,* Feld at 15 (2003). This transition corresponds with the heightened ability to control behavior, suppress impulses, and anticipate consequences. *See id*. Most recent research indicates that a period of "emerging adulthood," ranging from age 18 to 25, follows adolescence and "has been characterized as a period of continuing development and continuing risk."[6] Identification of emerging adulthood as a unique period of development is supported by research showing that the prevalence of certain risky behaviors, such as substance abuse and crimes against persons, peak in the late teens and early twenties. *See e.g.,* Fondacaro (2015). With the right interventions, (not prison) that same risky behavior can be effectively curtailed and result in a law abiding pro-social adults.

In 2010, the Federal Sentencing Commission even recognized the role youth plays at sentencing, and adopted a less restrictive downward departure standard on the basis of age. *See*

---

[5] Barry C. Feld, *Competence, Culpability, and Punishment: Implications of Atkins for Executing and Sentencing Adolescents*, 32 Hofstra L. Rev. 463, 515 (2003).
[6]

7

Sent'g Guidelines §5H1.1; U.S. Sent'g Comm'n, *Youthful Offenders in the Federal System* at 4 (2017). The Commission amended the language of §5H1.1 "after reviewing recent federal sentencing data, trial and appellate court case law, scholarly literature, public comment and testimony, and feedback in various forms from federal judges." *Id.* at 4. The Commission notes that one of the oft cited reasons by judges at sentencing for a downward departure is "age or lack of guidance as a youth." *Id*. at 40. In further response to this growing body of research, the Sentencing Commission released a report analyzing "a study group of all 86,309 youthful offenders sentenced from fiscal year 2010 to fiscal year 2015." *Id*. at 10. *Youthful offenders are defined as those twenty-five years of age and younger. See id*. at 1. "The inclusion of young adults in the definition of youthful offenders is informed by recent case law and neuroscience research in which there is a growing recognition that people may not gain full reasoning skills and abilities until they reach age 25 on average." *Id*. at 5. "People at different stages of these [development] processes have different brain structures and function compared to people who have fully developed brains." *Id*. at 6. These differences in brain function manifest in risky behaviors in which the actors have diminished capacity to appreciate consequences. *See id*. at 6.

      At age 21, if Matthew is found guilty, meets the federal sentencing commission's definition of a youthful offender.  This court should weigh notions of dangerousness more leniently for this emerging young adult.  Our proposed new environment with his grandfather combined with other pretrial conditions should give this court confidence that his past mistakes aren't intractable character traits.  The hopefulness in youth is that emerging young adults can change significantly during this developmental stage.  It takes less jail time to see significant deterrent effect on their behavior.  Emerging adulthood should not be unfairly labeled as dangerous or incorrigible.  Matthew has several years to reach full development.  It is neurologically, psychologically and

physically dangerous to have him housed in Federal Prison (even pre-trial) and the impact can negatively impact his life and the safety to the community for years to come.

### III. DETAINING MATTHEW IS NOT ONLY LEGALLY UNSUPPORTED, BUT IS ALSO HARMFUL AND UNECESSARY

#### A. A Few Days of Detention Can Have Disastrous Consequences on Someone's Life.

Congress was correct to cabin pretrial detention to "extreme and unusual circumstances," because even very short periods of detention have been shown to seriously harm defendants. For example, according to a recent study published by the Administrative Office of the U.S. Courts, 37.9% of federal defendants detained fewer than three days reported having a negative outcome at work (such as losing their job).[7] Likewise, 29.9% of people detained fewer than three days reported that their housing became less stable.[8]  In other words, a substantial minority of people held for only one or two days in federal cases still lose their jobs or their housing as a result of the brief detention. The first few days of detention can also be dangerous. According to the Bureau of Justice Statistics, between 38% and 45% of all jailhouse rapes perpetrated on a male victim happen within three days of admission.[9]  Over 40% of people who die in jail die within their first week.[10]  Despite the trauma and danger inherent in the first few days of a jail stay, jails' physical and mental health screenings and treatment offerings are often inadequate.[11]  In sum, detaining Matthew any longer is unwarranted--it could also jeopardize his physical, financial, and mental wellbeing.

---

[7] Alexander M. Holsinger & Kristi Holsinger, *Analyzing Bond Supervision Survey Data: The Effects of Pretrial Detention on Self-Reported Outcomes*, 82(2) Federal Probation 39, 42 (2018), archived at https://perma.cc/LQ2M-PL83.
[8] *Id.*
[9] Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09*, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK.
[10] Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.
[11] 16 *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman, et al., *Drug Treatment Services for Adult Offenders: The State of the State,*

Based on the courts closing comments on March 4, 2022, we understand this court is concerned that Matthew's past performance on conditions may be an indication of future performance. We disagree. Matthew's State conditions allowed him to lawfully be in D.C. on January 6, 2021. He was given low-level supervision, he wasn't well monitored, and the conditions were not enforced. The quality of State Supervision can't be compared to what this court can impose through its order. As recently as February 22, 2022, it is noteworthy that our Pre-trial Services spoke to Matthew's State Probation Officer whom verified his compliance with his conditions prior to his current arrest: "On 2/22/2022, PSA spoke with the defendant's probation officer Tiffany Sanders whom reported that prior to the defendant's arrest he was compliant with his conditions of release set forth by the court." Docket Entry 8, pp. 4.

| **State Pre-Trial Bond--1.2.2020** | Enforced? |
|---|---|
| 1. $100,000 Sec. Bond | |
| 2. Curfew 6pm-6am | No |
| 3. NCO Victim/V.Family | |
| 4. Work w/dad | |
| 5. Dad to know whereabouts at all times | |
| 6. Live with Parents | |
| 7. No Access to Social Media | No |
| 8. No Access to Guns in the Home | |

| **State Probation Post-Conviction Conditions --8.16.2021**[12] | Enforced? |
|---|---|
| 1. Provide DNA Sample | |
| 2. Monetary Condition: $428 | |
| 3. Commit no criminal offense in anywhere | |
| 4. Possess no firearm, explosive device, or other deadly weapon listed in G.S. 14-269. | |
| 5. Remain gainfully employed, or pursue education or vocational training | |
| 6. Satisfy child support and family obligations, as req. by the Court | |

---

[12] *See* Dkt. 11, Exhibit 3 at pp. 2 for a verbatim description of the State post-conviction Probation conditions.

| | |
|---|---|
| 7. Submit photographs, including photographs of the defendant's face, scars, marks, and tattoos, to be included in his records. | |
| 8. Not abscond, by willfully avoiding supervision or making his whereabouts unknown | |
| 9. Remain within the jurisdiction of the Court unless granted written permission | |
| 10. Report as directed by the Court or the probation officer, permit the officer to visit at reasonable times, answer all reasonable inquiries by the officer and obtain prior approval from the officer for, and notify the officer of, any change in address or employment. | |
| 11. Notify the probation officer he fails to obtain or retain satisfactory employment. | |
| 12. Submit at reasonable times to warrantless searches by a probation officer of his person, premises, and vehicle. | |
| 13. Submit to warrantless searches by a law enforcement officer of his person and vehicle upon a reasonable suspicion | |
| 14. Not use, possess, or control any illegal drug or controlled substance unless prescribed or knowingly associate with any known or previously convicted users, possessors, or sellers of controlled substances; and no knowingly be present at or frequent any place where illegal drugs or controlled substances are sold, kept, or used. | |
| 15. Supply a breath, urine, or blood specimen for analysis of the possible presence of prohibited drugs or alcohol when instructed by the defendant's probation officer for purposes directly related to the probation supervision. If the results of the analysis are positive, the probationer may be required to reimburse the Division of Adult Correction and Juvenile Justice for the actual costs of drug or alcohol screening and testing. | |
| 16. Waive all rights relating to extradition proceedings if taken into custody outside of this State for failing to comply with the conditions imposed by the court. | |
| "Other: REMAIN EMPLOYED AT LEAST 25 HRS/WEEK; PAY $100 PER MONTH BEGINNING 9/1/21 TOWARD COURT COSTS; AFTER 12 MONTHS IF ALL MONIES ARE PAID & IN COMPLIANCE THE DEF CAN BE TRANSFERRED TO UNSUPERVISED; WAIVE SUPERVISION FEES | |

After Matthew was convicted (August 16, 2021) neither his Standard nor Special Conditions imposed in State Court prevented him from access to the internet or social media.

11

Without restrictions and the protection of the First Amendment, all his posts/viewpoints after August 16, 2021 were permissible.  Meaning, the posts raised by the government dated February 3, 2022, February 4, 2022, and February 5, 2022, were not probation violations. Dkt. 11 at pp. 10-11.  Furthermore, they were all lawful expressions of Free Speech. *See Brandenburg v. Ohio,* 395 U.S. 444 (1969) (Incitement to Imminent Lawless Action) and *Virginia v. Black,* 538 US 343 (2003) (The True Threat Doctrine).  *Brandenburg* remains the crucible to assess Free Speech.  In *U.S. v. Miselis*, the Fourth Circuit Court of Appeals recently affirmed the *Brandenburg* standard as the prevailing "modern" standard.  *See also U.S. v. Miselis*, 972 F.3d 518 at 525 (2020)( While the category of speech that lies at the core of the Anti-Riot Act's prohibition, called "incitement," has never enjoyed First Amendment protection, the statute sweeps up a substantial amount of speech that remains protected advocacy under the modern incitement test of *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam).  In *Miselis*, the court struck two provisions of the Anti-Riot Act because it was overbroad.

This court raised "concerns" about at least two of his posts:  1) November 17, 2020, allegedly wishing a slow death to "Antifa". *Id. at pp. 9;* and 2) January 19, 2022 regarding "reclaiming America". *Id.* at pp. 10.  Neither of those two statements violate Free Speech because they can't overcome the First Amendment protections he is owed because his words are viewpoints, and wishful thinking rather than incitement to imminent lawless action.  Imminence is an even bigger hurdle in the social media context where Matthew and the receiver are anonymous, making it difficult to amount to a true threat.  Even if you believed Matthew intended violence, he can't identify or locate the listener to carry out his ideas. Actual violence was not intended.  It would be inappropriate in the pre-trial release posture to rely on those posts to conclude he is general danger to the community under 18 U.S.C. 3142(f).  The BRA does not

authorized a general threat to the community to justify detention. It is noteworthy that the January 19, 2022 statement was also post-conviction and not part of his Probation limitations. Regardless, all of these concerns can be ameliorated by imposing conditions that restore his limits to social media, limit internet access, and/or monitor any of his devices.

### B. Pretrial Detention has a Proven Criminogenic Affect and High Costs to the Community.

On March 4, 2022 I also referenced the criminogenic effect of pre-trial incarceration on Matthew. An AO study found a relationship "between the pretrial detention of low-risk defendants and an increase in their recidivism rates, both during the pretrial phase as well as in the years following case disposition."[13] More recent studies have confirmed that pretrial detention is criminogenic.[14] One reason why pretrial detention is criminogenic is because jails' physical and mental health screenings and treatment offerings are often inadequate.[15] Additionally, federal "pretrial detention is itself associated with increased likelihood of a prison sentence and with increased sentence length," even after controlling for criminal history, offense severity, and socio-economic variables.[16] These stark statistics must also be considered in light of the fact that 99% of federal defendants are not rearrested for a violent crime while on pretrial release.[17] In other words, pretrial detention imposes enormous costs on criminal defendants, their loved ones, and the community, in a counterproductive attempt to prevent crimes that are extremely unlikely to happen in the first place. There are also significant fiscal costs associated with high federal pretrial

---

[13] Austin, *supra* note 2, at 54 (citing Christopher T. Lowenkamp et al., *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (The Laura and John Arthur Foundation 2013), archived at https://perma.cc/8RPX-YQ78).
[14] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 718 (2017), archived at https://perma.cc/5723-23AS ("[D]etention is associated with a tallied as a benefit of pretrial detention."
[15] *See* Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Just. Stat., at 9 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails); *see also* Faye S. Taxman et al., *Drug Treatment Services for Adult Offenders: The State of the State*, 32 J. Substance Abuse Treatment 239, 247, 249 (2007), archived at https://perma.cc/G55Z-4KQH.
[16] James C. Oleson et al., *The Sentencing Consequences of Federal Pretrial Supervision*, 63 Crime & Delinquency 313, 325 (2014), archived at https://perma.cc/QAW9-PYYV.
[17] Thomas H. Cohen et al., *Revalidating the Federal Pretrial Risk Assessment Instrument: A Research Summary*, 82(2) Fed. Prob. 23, 26 (2018), archived at https://perma.cc/8VM9-JH9T.

detention rates. As of 2016, the average pretrial detention period was 255 days (although several districts averaged over 400 days in pretrial detention).[18] Pretrial detention costs an average of $73 per day per detainee, while pretrial supervision costs an average of just $7 per day.[19] Thus, 255 days of pretrial detention costs taxpayers an average of $18,615 per detainee, while pretrial supervision for the same time would cost an average of $1,785.

## IV.   MATTHEW SHOULD BE RELEASED ON BOND CONDITIONS

Pretrial conditions are more than sufficient to confidently release Matthew Beddingfield and properly implement the Bail Reform Act. The proposed pretrial release conditions listed below will "reasonably assure" Matthew's appearance and community safety.

**Under § 3142(c)(1)(B), the available conditions include:**

- Place client in custody of third party custodian "who agrees to assume supervision and to report any violation of a release condition to the court" [(i)]
- Maintain or actively seek employment [(ii)]
- Maintain or commence an educational program [(iii)]
- Follow restrictions on "personal associations, place of abode, or travel" [(iv)]
    - Can include electronic monitoring, GPS monitoring, home detention (which allows
    - defendant to leave for employment/schooling/etc.), home incarceration (re: 24-hour
    - lockdown).
    - Can include residence at a halfway house or community corrections center.
- Avoid "all contact with an alleged victim of the crime and with a potential witness who may
testify concerning the offense" [(v)]
- Report on a "regular basis" to PTS or some other agency [(vi)]
- Comply with a curfew [(vii)]
- Refrain from possessing "a firearm, destructive device, or other dangerous weapon" [(viii)]
- Refrain from "excessive use of alcohol" [(ix)]
- Refrain from "any use of a narcotic drug or other controlled substance . . . without a
- prescription" [(ix)]
- Undergo "medical, psychological, or psychiatric treatment, including treatment for drug or alcohol dependency" [(x)]

---

[18] Austin, *supra* note 2, at 53.
[19] *Id.*

14

- ☐ Post "property of a sufficient unencumbered value, including money" [(xi)]
- ☐ Post a "bail bond with solvent sureties" [(xii)]
- ☐ Require the client to "return to custody for specified hours following release for employment,
- ☐ schooling, or other limited purposes" [(xiii)]
- ☐ **Or "any other condition that is reasonably necessary to assure the appearance of the person as required and to assure the safety of any other person and the community." [(xiv) (emphasis added); this allows any party to be creative about proposing other conditions].**

V.  CONCLUSION

When this court properly balances the BRA presumption of release with the characteristics of Matthew, there are clearly combinations of conditions that justify release. He has all three of the pillars that support success while in the community: Housing, employment, and no known substance abuse issues. Once his prior conviction and Free Speech are cabined within their required constitutional protections, there is not much left to sustain a finding in favor of detention. The government arguments about his dangerousness fall short. This court has the resources, personnel, and authority to issue an effective release order. We request the court release Matthew to his grandfather. Both of them will be surrounded by a supportive community of family, friends and Pretrial Services to assist Matthew in fully complying with this court's order.

Respectfully submitted this 7th day of March, 2022.

FEDERAL PUBLIC DEFENDER OF
EDNC RALEIGH

By: */s/ Kyana Givens*
KYANA GIVENS
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina  27601
Telephone:  919-856-4236
Fax:  919-856-4477
E-mail:  Kyana_Givens@fd.org
Washington Bar No. 37670

LR 57.1 Counsel, Appointed

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served upon:

SEAN P. MURPHY
Assistant United States Attorney
Detailee, Capitol Siege Section
District of Puerto Rico
Torre Chardón, Suite 1201
350 Carlos Chardón Avenue
San Juan, PR 00918

by electronically filing the foregoing with the Clerk of Court on March 7, 2022, using the CM/ECF system which will send notification of such filing to the above.

This the 7th day of March, 2022.

*/s/ Kyana Givens*
KYANA GIVENS
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Kyana_Givens@fd.org
Washington State Bar No. 37670
LR 57.1 Counsel, Appointed