**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-CR-66 (CJN)** |
| **MATTHEW JASON BEDDINGFIELD** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Jason Beddingfield to a 42-month term of incarceration, a three-year term of supervised release, $2,000 in restitution, and a $100 mandatory assessment. According to the Guidelines and Criminal History Category as calculated by the parties and agreed to by the U.S. Probation Officer, a term of 42 months is approximately the midpoint of the 37-to-46-month Guidelines range.

## I.    INTRODUCTION

The defendant, Matthew Jason Beddingfield, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered because of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On January 6, 2021, Matthew Jason Beddingfield traveled to Washington, D.C., with his father[2] to protest Congress' certification of the Electoral College. While the United States Congress was inside the United States Capitol attempting to carry out its Constitutionally mandated duty, Beddingfield was on Capitol grounds using a flagpole with the Star-Spangled Banner still attached to strike police officers who were attempting to protect both the Capitol and those inside. After attacking the police officers with the flagpole, Beddingfield threw a piece of the broken flagpole at another officer. Beddingfield then faced the Capitol and made a gesture (one that is commonly associated with the Nazis), extending his arm and hand forward and at an upward angle. After entering the Capitol and spending nearly 30 minutes inside, Beddingfield finally left the Capitol out the North Door. When Beddingfield committed these acts, he was on conditions of pretrial release in Johnston County, North Carolina, while awaiting trial there on a charge of Attempted Murder.[3]

Before the events of January 6, 2021, and specifically on November 17, 2020, Beddingfield wrote to an unidentified Instagram user, "Anyone who is in antifa deserves a slow death. They are literally communists." Nearly a year after the events at the Capitol, on January 19, 2022, Beddingfield wrote to an unidentified Instagram user, "I'd like to reclaim America and it is fine if a few of my peoples enemies are 'hurt' in the process."

For all these reasons, a 42-month term of imprisonment is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the

---

[2] At this time, Beddingfield's father has not been charged with any crimes in relation to his known actions in Washington, D.C., on January 6, 2021.

[3] Beddingfield ultimately entered an *Alford* plea in that case to the lesser charge of Assault with a Deadly Weapon Inflicting Serious Injury.

public from further crimes of the defendant.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 40, for a short summary of the January 6, 2021, attack on the United States Capitol by thousands of rioters to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.   Injuries and Property Damage Caused by the January 6, 2021, Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (former Chief Judge Howell); *United States v. Matthew Mazzocco*, 21-CR-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and

Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *Id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

### C. Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



***Image 1:*** *Open-source rendering of Capitol building and grounds as they appeared on January 6, 2021, credited to Twitter handles @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



***Image 2:*** *Screenshots from USCP security footage showing the progression of the crowd, from the outer barricades (top left) to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left) and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Image 3:* *The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard, which would later be used against the police line like a battering ram, is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with a melee and

visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**



***Image 4:*** *Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse. Individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### D.        Beddingfield's Role in the January 6, 2021, Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, Matthew J. Beddingfield and his father attended the former President's rally near the White House and the Washington Monument on the National Mall.[4] Beddingfield and his father separated, and his father approached the Capitol from the Pennsylvania Walkway while Beddingfield approached from the Maryland Walkway. A publicly available Parler video[5] shows Beddingfield walking past several clearly visible AREA CLOSED signs and USCP officers. The voice of the videographer can be heard stating:

> THEY'RE MOVING PAST THE POLICE. THEY'RE TEARING DOWN THE BARRIERS. THE POLICE ARE MOVING. THIS IS ACTUALLY HAPPENING PEOPLE. THEY'RE GOING IN. THIS IS ACTUALLY HAPPENING.



***Image 5:*** *A screenshot from an open-source video showing Beddingfield approaching the Maryland Walkway of the U.S. Capitol. Notable in this screenshot are the two USCP officers in front of Beddingfield as well as the dozens of clearly visible signs stating, AREA CLOSED By order of the United States Capitol Police Board.*

---

[4] https://youtu.be/N-l5EZjH69Q?t=1620

[5] https://web.archive.org/web/20210110203742/https://parler.com/post/e89bd711814240ecb7ee00afabba71f5 (timestamp 00:10)

Not only was Beddingfield a part of the mob that overtook USCP officers at the Maryland Walkway, but he was also at the front of it. Another publicly available video shows the moment rioters pushed past the bike rack barriers surrounding the Capitol and swarmed onto the West Plaza. Specifically, at approximately 01 min 06 sec in the video, a small number of USCP are seen retreating from the rioters back towards the Capitol. At approximately 01 min 21 sec, Beddingfield is seen with the group following those officers towards the Capitol.

 

***Image 6 and Image 7:*** *(left) A screenshot from an open-source video showing Beddingfield approaching the Maryland Walkway of the U.S. Capitol about fifteen seconds behind USCP officers who were retreating from the mob; and (right) a publicly available photo from Facebook[6] showing Beddingfield on the Maryland Walkway.*

---

[6] https://www.facebook.com/photo/?fbid=10159282729372941

 

***Image 8*** *and* ***Image 9****: An image taken from NBC News Justice reporter Ryan J. Reilly's thread[7] showing Beddingfield walking towards the SW scaffolding of the Western Plaza of the Capitol via the Maryland Walkway sometime between 12:55 p.m. and 12:57 p.m.; and a map created by private citizens[8] with a red star indicating the approximate location of Beddingfield in the image.*



***Image 10****: Beddingfield is once again towards the front of a group of rioters advancing towards police officers on the West Plaza.[9]*

---

[7] https://twitter.com/ryanjreilly/status/1379501801716744199

[8] https://jan6attack.com/maps.htm

[9] https://www.youtube.com/watch?v=DHessyWYXqM&t=560

While on the West Plaza, Beddingfield and the other members of the mob knew they should

not be there; indeed, some rioters held up the AREA CLOSED signs as they chanted in protest.



***Image 11:*** *A screenshot from an open-source video of the West Plaza at the same time Beddingfield was there that shows a rioter holding up an AREA CLOSED sign while yelling towards the Capitol.*

### Beddingfield's Assault of U.S. Capitol Police Officers

While on the West Plaza, Beddingfield continued to chase down police officers, put

himself at the front of the line, and violently attack the police officers who were attempting to

keep rioters back and away from the Capitol. While Beddingfield's actions may be seen from

many angles and viewpoints, one open-source video in particular shows the progression of his

actions and the escalation of his attacks.[10]  At about 43 seconds into that video (Media Tower Video), Beddingfield can be seen on the West Plaza, making his way towards the violence of the front line.





**Image 12 and Image 13:** *Two screenshots from the Media Tower Video showing Beddingfield moving deliberately towards the chaos and violence of the line between police officers and the rioters.*

---

[10] https://archive.org/download/kyNdLWhiBor3d3BpA/kyNdLWhiBor3d3BpA.mpeg4

In the video, once the police officer turns their back to him, at about 1 min 00 sec, Beddingfield rushes to the front and begins attacking police officers. At one point he appears to kick at the line of officers. His flurry of untethered attacks lasts about 30 seconds.



*Image 14:* A screenshot from the Media Tower Video showing Beddingfield jabbing and stabbing police officers with a flagpole that had the American flag still attached.

 

*Image 15 and Image 16:* Two screenshots from the Media Tower Video showing Beddingfield kicking at police officers and swiping at the face of a police officer with a flagpole while the officer was not looking.



***Image 17:*** *A screenshot from the Media Tower Video showing Beddingfield making a gesture associated with the Nazis while facing towards the U.S. Capitol.*

With vitriol yet in his tank, Beddingfield then took his bent flagpole, broke off a damaged piece, and threw that into the line of police officers.



***Image 18:*** *A screenshot at approximately 09 min 45 sec of an open-source video[11] showing Beddingfield throwing a broken piece of his flagpole at the U.S. Capitol Police officers.*

---

[11] https://www.bitchute.com/video/mNmU8tvsrkep/

Among those officers whom Beddingfield attacked was former USCP Sergeant Aquilino Gonell, who later recalled in his Victim Impact Statement that "Rioter Beddingfield desecrated the American flag by using it as weapon. He had a flag still attached to the pole and used it as a spear against me [ . . . ]." In that same statement, Sgt. Gonell continued:

> [Beddingfield's] jabs with the flagpole landed a couple of times on my thighs and groin area causing excruciating pain. The vicious hits by him kept coming until his flagpole bended, nearly breaking from so many strikes he did on us. [ . . . ] I lived through the onslaught as it was happening, and I barely survived it. I still have PTSD, remembering what Rioter Beddingfield did to me and my colleagues that day.

Victim Impact Statement, p. 1. Sgt. Gonell has advised the government that he would like to read his Victim Impact Statement in person at the sentencing hearing.

After his attacks on police, Beddingfield made his way to the Upper West Terrace Door and walked inside. For a moment, Beddingfield seemed unsure of where to go or what to do. He marched in circles around the Rotunda. He got on his phone. All it took, however, was a pocket of violence in the north hallway of the second floor, and Beddingfield was back in action.

The hallway where the violent conflict between the rioters and police took place stretches north from the Rotunda to the Ohio Clock Corridor, or just outside the Senate Chamber. Rioters, including Beddingfield, were pushing up against and attacking a small group of police officers who were trying to keep the rioters from further infiltrating the Capitol.



**Image 19:** *A screenshot from approximately 04 min 50 sec on an open-source video[12] showing Beddingfield moving towards the front of a group of rioters that was attacking police near the Old Senate Chamber.*



**Image 20:** *A screenshot from a video provided by a French news media company where the reporter is in the Small Senate Rotunda and Beddingfield—apparently reacting to the effects of a chemical irritant—can be seen in the background.*

---

[12] https://www.newsflare.com/video/402653/mob-incited-by-trump-storms-interior-of-capitol-including-offices-of-mcconnell-and-pelosi-in-terrifying-act

As seen above, once Beddingfield was hit with a chemical irritant he retreated from the line and once again began wandering through the Capitol. He then entered an office of then Minority Leader Kevin McCarthy, and attempted to wash his eyes in a drinking fountain before eventually leaving the Capitol through the North Door. In total, Beddingfield was in the Capitol approximately 30 minutes and on restricted Capitol grounds more than two hours.

### III.   THE CHARGES AND PLEA AGREEMENT

On March 4, 2022, a federal grand jury returned an indictment charging Matthew Jason Beddingfield with nine counts, including Assaulting, Resisting, or Impeding Certain Officers, a violation of 18 U.S.C. § 111(a)(1) (Count Three). On, February 16, 2023, Beddingfield was convicted of this offense based on a guilty plea entered pursuant to a plea agreement.

### IV.   STATUTORY PENALTIES

Beddingfield now faces sentencing on Count Three of the indictment, charging 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers. As noted by the plea agreement and the Draft Presentence Report issued by the U.S. Probation Office (ECF No. 42), the defendant faces up to eight years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V.       THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The government and the defendant, through counsel, agreed that the appropriate Guidelines calculation is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | + 4 |
| U.S.S.G. § 3A1.2 | Official Victim | + 6 |
| | **Total** | **24** |

The parties further agree that the following reductions apply:

| | | |
|---|---|---|
| U.S.S.G. § 3E1.1(a) | Acceptance of Responsibility | - 2 |
| U.S.S.G. § 3E1.1(b) | Upon Motion of Gov't | - 1 |
| | **Adjusted Total** | **21** |

The government has no objection to the Guidelines as calculated by the U.S. Probation Office in the Draft PSR, as it mirrors the calculation as agreed upon by the parties. ECF No. 42, ¶¶ 36-46. Further, the U.S. Probation Office calculated Beddingfield's criminal history as category I, which is not disputed. *Id*. at ¶ 50. Accordingly, based on the parties' calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 21, Beddingfield's Guidelines is 37-46 months' imprisonment.

## VI.      SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.       Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Beddingfield's felonious conduct on January 6, 2021, was part of a massive riot that nearly succeeded in preventing the certification

vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. While on pretrial conditions of release, Beddingfield traveled to Washington, D.C., from North Carolina, confronted and attacked police officers on the West Plaza when they were at their most vulnerable, unlawfully breached the U.S. Capitol where the certification was taking place, joined a mob that was specifically pushing towards the Senate Chamber, and entered the office of a Member of Congress before finally leaving. The nature and circumstances of Beddingfield's offense were of the utmost seriousness, and fully support the government's recommended sentence of 42 months' incarceration.

**B.      The History and Characteristics of the Defendant**

Despite his young age, Beddingfield has now been an active participant in two extremely troubling and violent events, the insurrection at the United States Capitol and a shootout in a Walmart parking lot where he shot a minor in the head (the victim survived). After the shooting in the parking lot, police recovered numerous shell casings from ammunition, observed car tires that were flattened by stray bullets, and recovered a portion of the minor victim's skull. After the FBI arrested Beddingfield in this case, by which time Beddingfield was a convicted felon, agents found thousands of rounds of .22 caliber ammunition throughout Beddingfield's home, including in common areas or areas to which Beddingfield had access.

After January 6, 2021, Beddingfield continued to engage in life-threatening and severely reckless behavior by driving 110 m.p.h. in a posted 65 m.p.h. speed zone. [13] Beddingfield committed this violation of the law while he was serving his term of probation for the shooting

---

[13] The government notes that in 2021, the National Highway Traffic Safety Administration reported, "Twenty-eight percent of fatal crashes, 13 percent of injury crashes, and 10 percent of property-damage-only crashes in 2020 were speeding-related."

https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813320

conviction. The excessive speeding is yet another aspect of Beddingfield's history and characteristics where he continues to show that he will disregard court orders, disregard the law, and endanger members of the community. Since one of the factors this Court must consider while crafting its sentence is "to protect the public from further crimes of the defendant," this Court must take full account of Beddingfield's repeated actions that jeopardize both his life and the lives of innocent community members around him.

For these reasons Beddingfield's violent internet rhetoric is also relevant for this Court's consideration in crafting a sentence. As noted above, before the events of January 6, 2021, and specifically on November 17, 2020, Beddingfield wrote to an unidentified Instagram user, "Anyone who is in antifa deserves a slow death. They are literally communists." Nearly a year after the events at the Capitol, on January 19, 2022, Beddingfield wrote to an unidentified Instagram user, "I'd like to reclaim America and it is fine if a few of my peoples enemies are 'hurt' in the process." In light of Beddingfield's violent conduct on January 6, his violent words -- even weeks after January 6 – underscore his willingness to use violence to achieve his goals.[14]

The government notes that Beddingfield provided the United States Probation Officer with a written statement that he accepts full responsibility for his conduct, stating "I am very sorry." PSR ¶ 35. Whether this is sincere is for the court to judge, but the government observes that many January 6 rioters have been remorseful when before the court, only to disclaim any responsibility – and indeed, embrace their conduct on January 6 – as soon as the sentencing hearing is concluded.

---

[14] In her Recommendation, the United States Probation Officer states that "Beddingfield's social media presence both before and after January 6th reveals an expressed desire to inflict violence on individuals of certain groups, concerns that should be monitored during the period of supervised release to protect the safety of the community." Recommendation (ECF 45), p. 2. The government agrees with this recommendation and the Probation Officer's recommendation for anger management treatment while on supervised release. *Id.*

Moreover, as to Beddingfield in particular, the government notes that his criminal record and social media suggest immaturity and impulsiveness.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Beddingfield's criminal conduct on January 6 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[15] Nearly 30 months after January 6, 2021, there is at least some evidence that government's uniform approach to sentencing has achieved and will continue to achieve its desired general deterrence effect. For example, Rachel Kleinfeld, a senior fellow in the Democracy, Conflict and Governance Program at the Carnegie Endowment for International Peace, recently spoke with the New York Times, about the violent rhetoric but lack of violence in Miami, Florida, on Tuesday, June 13, 2023. "One reason for the absence of conflict in Miami, Ms. Kleinfeld wrote in an email, was that the prosecutions of Jan. 6 protesters — which now amount to more than 1,000 criminal cases — have had 'a real deterrent effect' on those who might have once considered violence."[16]

The demands of general deterrence continue to weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

[16] https://www.nytimes.com/2023/06/15/us/politics/trump-protests-proud-boys.html

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although Beddingfield has a criminal history category of I, his history of arrest and conviction shows a clear pattern of violent and community-endangering behavior. *See* Section VI(B) *supra.* Second, although Beddingfield has now expressed remorse and contrition, his social media statements before and after January 6 (but pre-arrest) were those of a young man not only girding for another battle but seeking to grow any viable sparks of dissent into a full conflagration. This kind of prisoner's penitence should do little to move the needle in favor of a lighter sentence. *See United States v. Matthew Mazzocco*, 21-CR-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Beddingfield's own statements espousing violence all show the need for a sentence that must provide specific deterrence to Beddingfield from committing future crimes of violence.

E.     **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007)

(quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[17]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[18]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[17] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[18] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In February 2023, this Court sentenced defendant Garret Miller to 38 months' incarceration after he pleaded guilty without a plea agreement to nearly every count on a superseding indictment, including one count of 18 U.S.C. § 111(a)(1). *United States v. Miller*, 21-CR-119 (CJN) (D.D.C.), ECF No. 147. Distinguishing Miller from Beddingfield is a straightforward task. While Miller also plead guilty to assaulting, resisting, or impeding a police officer, there were no allegations that he did so while using a dangerous instrument. In the case of Beddingfield, as part of the plea agreement, Beddingfield agrees that an additional enhancement applies to his Section 111(a)(1) conviction because the way in which Beddingfield used the flagpole rendered it a dangerous instrument, adding four levels under USSG § 2A2.2(b)(2)(B).

Further, although Beddingfield and Miller have the same CHC of I, Miller had no prior convictions, while Beddingfield has plead guilty pursuant to an *Alford* plea to Assault with a Deadly Weapon Inflicting Serious Injury after shooting a minor in the head with a pistol in a Walmart parking lot. Beddingfield was also on conditions of pretrial release when he assaulted a police officer during an insurrection and illegally entered the United States Capitol. While on probation for the local felony conviction, Beddingfield recklessly endangered the lives of others while driving his car at speeds exceeding 100 m.p.h. on the Interstate, again showing his inability to follow the law and comply with court orders. A higher sentence is warranted for Beddingfield than Miller in part because Beddingfield has a prior felony conviction for a violent crime and was on conditions of pretrial release for attempted murder when he willingly, voluntarily, and violently participated in the mob during an insurrection. Sentencing Beddingfield to 42 months' incarceration would not be inconsistent with the Court's sentence imposed in *Miller*.

This Court should also consider the companion cases of *United States v. Mault* and *United States v. Mattice*, 21-CR-657 (BAH) (D.D.C.). Both defendants planned to bring various items to the Capitol on January 6 that prefigured their use of violence against police. Mault suggested bringing gloves, a baton, pepper spray, and "asskicking boots." Mattice filmed Mault as he encouraged police officers to stand aside on the West Plaza and helped lead the mob that penetrated the police line to force a retreat to the Lower West Terrace. They both made it to the mouth of the Lower West Terrace tunnel, where they deployed pepper spray against the police and gave canisters of spray to other rioters to do the same. Following the riot, they both characterized themselves as victims, claimed they had done nothing wrong, and lied to the FBI about their full involvement in the riot.

Their conduct was appalling. Unlike Beddingfield, however, neither Mault nor Mattice ever entered the Capitol. Nor did they have the violent criminal history of Beddingfield. Like Beddingfield, both defendants pled guilty to a single count of assault on a federal officer in violation of 18 U.S.C. § 111(a)(1). Just as the government is asking this Court to do, former Chief Judge Howell determined that the applicable Guidelines range was 37 to 46 months imprisonment, and she imposed a custodial sentence of 44 months. Here, Beddingfield's assaultive conduct on the West Plaza, his entry into the Capitol building, his participation in the violent push that took place near the Senate Chamber, and his violent rhetoric against anyone who Beddingfield deems to be his enemy support a comparable sentence to those imposed on Mattice and Mault.

Finally, the government asks this Court to consider the March 17, 2023, sentencing of Aiden Henry Bilyard (#HarvardSweats).[19] At 18 years old—20 at the time of his sentencing—he

---

[19] https://www.wavy.com/news/north-carolina/north-carolinas-youngest-defendant-sentenced-to-prison-for-his-role-in-the-violent-attack-at-u-s-capitol/

is also one of the youngest individuals to be arrested for their participation in the siege of the U.S. Capitol and violent attack of police officers on January 6, 2021. Beddingfield was 20 on January 6, 2021, and he will soon turn 23. Like Beddingfield, Bilyard spent time on the West Plaza and physically assaulted police officers. Bilyard used a product called Home Defense Pepper Gel to spray officers from a distance while Beddingfield used a flagpole with the American flag attached to directly strike Capitol police officers. Both eventually entered the Capitol and continued to contribute to the chaos and violence of the day. Judge Reggie B. Walton sentenced Bilyard to 40 months of incarceration followed by three years of supervised release.

As above, while there are many similarities between Beddingfield and Bilyard, Bilyard was not on pretrial conditions of release facing charges of attempted murder when he stormed the Capitol. Bilyard did not have a criminal history prior to his felony conviction for his actions on January 6, 2021. After January 6, 2021, but prior to his arrest, Bilyard was in basic training for the Air Force when first questioned by the FBI. Beddingfield engaged in online trolling and violence-laden hate-speech on social media in violation of the terms of his pretrial release in the attempted murder case. When the FBI arrested Beddingfield (a convicted felon), the FBI found guns and ammunition in accessible areas of his family's home and property. These and other factors support the government's recommendation of 42 months' incarceration.

## VII.   **RESTITUTION**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[20] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Officer D.C., is not known to have suffered bodily injury because of Beddingfield's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Beddingfield must pay $2,000 in restitution, which reflects in part the role Beddingfield played in the riot on January 6.[21] ECF No. 39, pp. 8-9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Beddingfield's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. ECF No. 42, ¶ 133.

---

[20] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[21] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   <u>CONCLUSION</u>

For the reasons set forth above, the government recommends that the Court impose a sentence of 42 months incarceration, a three-year term of supervised release, restitution in the amount of $2,000, and a $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Sean P. Murphy
Assistant U.S. Attorney