IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MATTHEW JASON BEDDINGFIELD | Case no. 1: 22-CR-66 (CJN) |

### SENTENCING MEMORANDUM

Twenty-year-old Matthew Beddingfield, together with his father, traveled on January 6 from rural North Carolina to the metropolitan city of Washington D.C. to hear President Donald J. Trump speak. The crowd appeared to be under the delusion that Congress could somehow reverse the outcome of a presidential election. Swept up in the fervor of the crowd, Matthew waved his American flag and moved with the crowd toward the Capitol.

Matthew walked directly to the West Plaza entrance of the US Capitol. As police officers used barriers to push back the crowd, Matthew lent his weight with the protester line pushing towards the Capitol. Matthew waved his flag at an officer but did not make any physical contact with that officer. Matthew moved with the surging crowd over to another line of officers where he tried to advance forward by pushing his flag at another officer. Matthew was unsure whether he even made contact with this officer until he reviewed video of the actual incident. Thankfully, the officer was not harmed in the encounter. Following a mass of people, Matthew walked into the Capitol while officers stood by and watched the group enter the

building.



Matthew walked through the Capitol Building, where he remained for about twenty minutes, waving his flag and aimlessly wandering the halls. Most of the time, Matthew was carrying his flag above the crowd to avoid harming anyone with it. There is no evidence Matthew was destructive while in the Capitol nor did law enforcement restrain Matthew. Eventually, a Capitol police officer ordered Matthew to leave the building and Matthew complied immediately and without protest. He peacefully left the building.



Matthew understands he broke the law by assaulting, resisting, or impeding a Capitol Police Officer. Having been raised to be grateful for what the Country has made possible for his family, Matthew is ashamed by the disgraceful scene at the Capitol that day. On January 6th, Matthew got caught up in the impassioned crowd and joined with them to gain entry to the Capitol. For his participation in this reckless and misguided conduct, he is sincerely remorseful. During the pendency of this case, Matthew has worked and saved his wages to pay his share ($2,000) of the restitution necessary to repair the damages to the Capitol.

The advisory guideline range of imprisonment for Matthew's offense conduct is 37 to 46 months. The United States Probation office submits that an active sentence of 42 months is warranted. An active sentence within the guidelines range, however, would be a "greater than necessary" punishment for Matthew's offense conduct in light of 18 U.S.C., Section 3553(a) factors. A Guidelines sentence would also create unwarranted sentence disparities between other January 6 defendants. Aside from

Matthew's interaction with officers at the barrier and on the steps, which lasted no more than a few seconds and resulted in no injury or property damage, nothing distinguishes his conduct from that of dozens of January 6 misdemeanants who received probationary sentences. Indeed, his conduct was a good deal less serious than that of some misdemeanants.

Matthew has already experienced significant punitive consequences for his participation in the events at the Capitol. The criminal charges— along with the intense media focus and attendant toxic publicity—have brought profound and lasting shame on Matthew and his family. During Matthew's pretrial detention, he was assaulted and suffered injuries requiring extensive dental work. Over the past year, he has been on home confinement with a grandparent and has not been able to live with his parents and siblings. As a condition of his release, Matthew has not been able to engage with his father.

### A. Other January 6 cases.

In *United States v. David Blair* 1:21-CR-186-CRC, Mr. Blair (age 27) was charged in a nine-count indictment [1]. Like Matthew, Mr. Blair was initially charged with two counts of violating 18 U.S.C., Sect. 111(a)(1) and (b) Assault resisting, or impeding certain officers using a dangerous weapon; one count of violating 18 U.S.C., Sect. 1752 (a)(1) and (b)(1)(A) Entering and remaining in a restricted building or grounds with a deadly or dangerous weapon; and one count of violating 18 U.S.C., Sect. 1752 (a)(2) and (b)(1)(A) Disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon.

---

[1] DOJ Statement - https://www.justice.gov/usao-dc/pr/maryland-man-pleads-guilty-felony-charge-offenses-committed-during-jan-6-capitol-breach

 

(1:21-CR-186-CRC; DE 1 pgs. 3-4)

The US Department of Justice's Press Release described the offense of Mr. Blair, age 27, as follows, "Blair was in a crowd that was illegally on the West Lawn of the Capitol. Officers with the Metropolitan Police Department ordered the crowd to "move back" away from the Capitol building. Blair positioned himself between officers and the crowd and began to walk in the space while waving a Confederate battle flag attached to a lacrosse stick. He yelled words to the effect of, "hell naw, quit backing up, don't be scared." As officers advanced, one officer pushed Blair back toward the crowd. Blair jumped back, squared his body to stand in front of the officer, shouted, and thrust the lacrosse stick at the officer towards the chest area." According to the Statement of the Offense, after Blair struck the officer, several officers restrained Blair on the ground using their batons.[2] Blair received a sentence of 5 months imprisonment and 18 months of supervised release.[3]

In *United States v. Bradley Rukstales* 1:21-CR-41-CJN-5, officers retreated down a flight of stairs after protestors threw chairs and unknown substances.

---

[2] 1:21-CR-186-CRC, DE 51.
[3] 1:21-CR-186-CRC, DE 66.

Rukstales (age 53) descended the stairwell, picked up one of the chairs at the bottom of the stairwell and threw it in the direction of the officers. Officers ordered Rukstales to leave the Capitol, but Rukstales refused. When officers attempted to arrest Rukstales, he resisted and two officers had to forcibly put Rukstales on the ground to restrain and arrest him.[4]  Rukstales received a sentence of 30 days custody and $500 restitution.[5]

 

(Screen Shots ABC News https://abc7chicago.com/ex-schaumburg-tech-ceo-sentenced-to-prison-in-us-capitol-riot-case/11227769/)

In *United States v. Mostofsky* 1:21-CR-00138-JEB, Mr. Mostofsky (age 35) pushed his way through the crowd to "lend his weight" with other protestors in an effort to push through the police barrier. He was one of the first to enter the Capitol. Inside, he joined a crowd that pursued a Capitol police officer up a staircase. Mr. Mostofsky left the building wearing a Capitol police bullet proof vest and riot shield.[6] He received an 8 months sentence, 1 year supervised release, 200 hours of community service, and $2000 restitution.[7]

Most of the armed assault cases thus far sentenced typically include conduct

---

[4] 1:21-CR-00041-CJN, DE 90.
[5] 1:21-CR-00041-CJN, DE 140.
[6] 1:21-CR-00138-JEB, DE 94.
[7] 1:21-CR-00138-JEB, DE 110.

far more aggravated than Matthew's offense conduct. Currently, the armed assault cases include six defendants throwing some sort of chemical or liquid at officers (*See,* Devlyn Thompson (age 28) assaulted an officer with a baton, sprayed pepper or bear spray at several officers, took a protective shield away from an officer to prevent the officer from protecting himself, and threw objects at officers[8]. Thompson received a 46 month sentence of imprisonment and 36 months supervised release[9]; Robert Palmer (age 54) threw objects and sprayed officers with pepper or bear spray,[10] and received a sentence of 63 months imprisonment and 36 months supervised release[11]; Matthew Miller (age 23) threw objects and sprayed entire contents of a fire extinguisher at officers,[12] and received a sentence of 33 months imprisonment and 24 months supervised release[13]; Greg Rudenacher (age 26) after smoking marijuana in the Capitol, sprayed an unknown liquid on officers[14] and received 41 months imprisonment with 36 months supervised release[15]; Cody Mattice (age 29) and James Mault (age 30) together sprayed multiple cans of chemicals on officers and passed out additional cans of chemicals to others in the crowd.[16] Both men were sentenced to 44 months imprisonment and 36 months supervised release[17]; Ricky Willden (age 39) sprayed a can of chemicals on officers[18] and received a sentence of 24 months incarceration with 36 months supervised release[19]. )

---

[8] 1:21-CR-00461-RCL, DE 10.
[9] 1:21-CR-00461-RCL, DE 38.
[10] 1:21-CR-00328-TSC, DE 23.
[11] 1:21-CR-00328-TSC, DE 35.
[12] 1:21-CR-00075-RDM, DE 59.
[13] 1:21-CR-00075-RDM, DE 74.
[14] 1:21-CR-193-BAH, DE 48.
[15] 1:21-CR-193-BAH,, DE 68.
[16] 1:21-CR-657-BAH, DE 44 and 48.
[17] 1:21-CR-657-BAH, DE 72 and 74.
[18] 1:21-CR-423-RC, DE 29.
[19] 1:21-CR-423-RC, DE 44.

Other cases involved extremely aggressive and assaultive conduct. ( *See,* Scott Fairlamb (age 44) pushed and shouted at officers and hit one officer in his face shield while carrying a police baton,[20] received a sentence of 41 months incarceration with 36 months supervised release[21]; Kevin Creek (age 47) while yelling at officers, struck several officers, kicked another officer[22] and received a sentence of 27 months incarceration and 12 months of supervised release[23];  Andrew Mazza (age 57) armed with a concealed revolver, joined an altercation occurring in the tunnel in the center of the platform.  He overpowered an officer, took the officer's baton and struck him with it while shouting at the officer.  Mazza also encouraged others to fight the officers and break the line.[24] Mazza received a sentence of 60 months imprisonment and 3 years supervised release.[25]  Alan Byerly (age 55) struck and wounded a reporter who was repeatedly assaulted by the mob, used a stun gun on officers,  and fought with officers who finally disarmed him.[26]  Byerly received a sentence of 34 months imprisonment followed by 36 months of supervised release.  Albuquerque Head (age 43) used a riot shield to strike officers, struck officers with his hand, wrapped his arm around one officer's neck and pulled him into a crowd of rioters, yelling, "I got one!"  The officer was subsequently assaulted, tased, and robbed.  The officer sustained significant and painful injuries.[27]  Head was sentenced to 90 months of incarceration followed by 36 months of supervised release.[28]

---

[20] 1:21-CR-120-RCL, DE 39.
[21] 1:21-CR-120-RCL, DE 57.
[22] 1:21-CR-645-DLF, DE 35.
[23] 1:21-CR-645-DLF, DE 59.
[24] 1:21-CR-736-JEB, DE 25.
[25] 1:21-CR-736-JEB, DE 41.
[26] 1:21-CR-527-RDM, DE 44.
[27] 1:21-CR-00291-ABJ, DE 124.
[28] 1:21-CR-00291-ABJ, DE 171.

In contrast to these defendants, Matthew's actions did not result in any physical injuries or property damage. He did not spray harmful chemicals at officers, he did not beat officers with their own batons, and he did not encourage others to beat the officers.

### A. PSR's Unconstitutional Inclusion of Protected Speech

United States Probation devoted a significant portion of Matthew's Presentence Report to recounting posts from Matthew's social media. Matthew's social media content is protected speech under the First Amendment to the United States Constitution and should not be considered as a relevant factor for sentencing.

If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), citing *Texas v. Johnson*, 491 U.S. 397 (1989). In *Thompson v. Trump, 590 F. Supp.* 35 46 (Case No. 21-CV-00400 (APM0, Case No. 21-CV-00586 )(APM), Case No. 21-CV-858 (APM)(D.C. 2022), the Honorable United States District Court Judge Amit P. Mehta authored a Memorandum Opinion and Order regarding who, if anyone, should be held civilly liable for the events of January 6th. In drafting its opinion, the Court briefed issues concerning protected political speech. Beginning with the ruling in *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), the Court noted *Brandenburg* involved the conviction of a member of the Ku Klux Klan under Ohio's Criminal Syndicalism statute. The Supreme Court overturned the defendant's conviction, finding the films to be protected speech. Articulating what is now termed the "*Brandenburg*," the Court said that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force

or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* Thus, *Brandenburg* has come to stand for the proposition that "mere advocacy" of the use of force or violence is protected speech; only when speech is directed at inciting imminent lawless action, and likely to do so, does it lose the cloak of the First Amendment's protection.

Four years later, in *Hess v. State of Indiana*, the Court applied *Brandenberg* to a defendant convicted under Indiana's disorderly conduct statute. 414 U.S. 105, 105–06, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973). The defendant was participating in a demonstration of between 100 and 150 people when the sheriff gave an order to clear the streets. As the sheriff passed him, Hess was standing off the street and said words to the effect of "We'll take the fucking street later" or "We'll take the fucking street again." *Id.* at 107, 94 S.Ct. 326. Witnesses testified that Hess did not appear to be exhorting the crowd to go back into the street, was not addressing any particular person, and though loud, was no louder than anyone else in the area. *Id.* Applying *Brandenburg* the Court overturned Hess's conviction. The Court observed that Hess's statement was "[a]t best, ... counsel for present moderation, at worst, it amounted to nothing more than advocacy of illegal action at some indefinite future time." *Id.* at 108, 94 S.Ct. 326. The Court said that, because Hess was not directing his statement to any person or group of persons, it could not be said he was advocating any action. *Id.* Also, "since there was no evidence or rational inference from the import of the language, that his words were intended to produce, and likely to produce, imminent disorder," his words could not be punished based on the mere "tendency to lead to violence," as the Indiana Supreme Court had held. *Id.* at 108–09, 94 S.Ct.

326 (citation omitted).

The last of the three cases is *NAACP v. Claiborne Hardware Co.*. The Court evaluated Charles Evers's speech in the context of the boycott, during which he said to several hundred people, referring to boycott violators, "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." 458 U.S. at 902, 102 S.Ct. 3409. In another speech Evers warned that "the Sheriff could not sleep with boycott violators at night," an implicit threat to Black persons that retaliation for shopping at white establishments could come at any moment without the protection of law enforcement. *Id.* The Court held that the "emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*." *Id.* at 928, 102 S.Ct. 3409. The court acknowledged that Evers had used "strong language" and observed that if his "language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that lawful conduct." *Id.* However, "[w]hen such appeals do not incite lawless action, they must be regarded as protected speech." *Id.* The Court also said that "[i]f there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence." *Id.* at 929, 102 S.Ct. 3409. But because there was no evidence that "Evers authorized, ratified, or directly threatened acts of violence," his words could not be used for such purpose. *Id.* The Court therefore vacated the damages award against Evers.

It is improper to consider an individual's protected free speech as a basis for a harsher sentence. The Court in *United States v. Cabrera,* 811 F.3d 801 (6th Cir. 2016) vacated a sentence based on the impermissible sentencing factor that Cabrera did not

testify. The Sixth Circuit ruled the district court's justification in imposing its sentence was at least partly relying on Cabrera not "putting it on the record." As Cabrera had a Fifth Amendment right to remain silent, considering defendant's silence was an impermissible factor to consider and vacated his sentence. In so doing the court held, "it is clear that a sentence based on an improper factor fails to achieve the purposes of § 3553(a) and may be unreasonable regardless of length," *quoting United States v. Malone,* 503 F.3d 481 (6th Cir.2007) at 808. Further, the D.C. Court of Appeals has held an appellant waiver does not preclude an appeal of sentences based on constitutionally impermissible factors. *United States v. Guillen*, 561 F.3d 527, 531 (D.C. Ct of Appeals 2009).

Accordingly, it was improper to include Matthew's protected speech in the PSR as it is an impermissible factor for consideration at sentencing. Matthew's protected speech should be stricken from the PSR so that it will not improperly impact his sentencing; and to avoid any prejudicial mistreatment should he receive an active sentence at the Bureau of Prisons.

### B. Matthew Beddingfield's background, family, employment history and character.

Matthew, now 22 years of age, was born and raised in rural North Carolina. He has lived in an intact family until he was subject to pretrial release conditions and ordered to leave his home and live with his grandfather, his third-party custodian. He was raised in a household of love and support and enjoyed church activities. *See Exhibit A, Jason Beddingfield, Phyllis Morris, Stacy Honeycutt, Angela Mcilvain.* Matthew and his father have complied with the no contact condition of Matthew's

pretrial release, but the compliance has been a very painful separation for both. Matthew, his brother, and father have a strong bond and the separation has been painful for the entire family.



Matthew is also close with his mother, sister and his sister's three children. His mother has worried about him and done everything she can to ensure Matthew knows his family supports him through this ordeal. Matthew's mother has repeatedly shared with us how sorry the family is for Matthew's participation in the events of January 6. Matthew's sister, in her character letter, tells the Court how devastating it would be for herself and her children if Matthew receives an active prison sentence. Matthew is a tremendous source of emotional support for his sister and her children. He spends time helping his sister care for her children and loves them. *See Exhibit B, Lynn Spivey.*





In 2018, Matthew graduated from high school.



After his high school graduation, Matthew immediately went to work full time. Since August 18, 2021, he has been gainfully employed with the same company. He

works a full-time schedule, has earned several raises and is a valued member of the company. Ms. Jessica Keefe, his employer, provides a character letter noting Matthew's work ethic and value to her business. *See Exhibit C, Jessica Keefe.* Ms. Keefe operates a scrap mental business. Matthew enjoys the work and plans to operate his own scrap business in the future.

Despite the tone of Matthew's social media content, Matthew's life and conduct have exhibited tolerance and inclusion. Matthew admittedly has flirted with QAnon rhetoric, but his social conduct has not been in accord with his social media rhetoric. One of his closest friends, Christian Thornton, is African American. Matthew and Christian have been friends for over ten years. They socialize together, help each other get jobs and currently work together. Christian describes his trust of Matthew as "like that of his own brother." During the course of their friendship, Matthew has visited with Christian's family in their home. Christian has observed Matthew interact with a variety of individuals. Christian advises he has never known Matthew to have difficulty with anyone based on their ethnicity, natural origin, religion, or culture. *See Exhibit D, Christian Thornton.*







Matthew at work and with co-workers.

### C. Matthew's Success on Pretrial Release

Matthew has been on extremely stringent conditions of release since March 17, 2022. Matthew has been in full compliance. United States Probation Officer Scott Plaster has been supervising Matthew in the Eastern District of North Carolina. Through his letter, Mr. Plaster informs the Court that Matthew has performed "admirably." *See Exhibit E, USPO Scott Plaster.*

### D. Forensic Report

At our request, forensic psychiatrist Dr. George Corvin and forensic psychologist Dr. Jim Hilkey conducted forensic mental health examinations of Matthew. Both doctors have previously been recognized by multiple federal courts as qualified experts in their respective fields. Dr. Hilkey opines that Matthew does not suffer from any intellectual deficits and Dr. Corvin has advised that Matthew does not suffer from any mental illness. *See Exhibit F, Dr. James Hilkey.* Dr. Corvin also determined that, although Matthew has expressed a number of beliefs others may find objectionable, Matthew is not psychiatrically ill. Dr. Corvin found Matthew to

be embarrassed by his actions on January 6th, and regrets getting "caught up" in the chaos. Dr. Corvin advised Matthew is a hardworking, compliant young man that just wants to get on with his life without any further troubles. *See Exhibit G, Dr. George Corvin*.

## Conclusion

Based on the foregoing and additional arguments to be presented at sentencing, Matthew Beddingfield respectfully requests a downward variance from the advisory guidelines range. A downward variance is necessary to achieve the objectives of sentencing, avoid unwarranted sentencing disparity, and provide a reasonable sentence for Matthew. A noncustodial sentence of home confinement, restitution, community service and a term of years of supervision would strike the right balance between punishment, deterrence and rehabilitation.

Respectfully submitted this 5th day of July, 2023.

G. ALAN DuBOIS
Federal Public Defender

/s/ Leza Lee Driscoll
LEZA LEE DRISCOLL
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Leza_Driscoll@fd.org
N.C. State Bar No. 20926
LR 57.1 Counsel Appointed

/s/ Rosemary Godwin
ROSEMARY GODWIN
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: rosemary_godwin@fd.org
N.C. State Bar No. 18217
LR 57.1 Counsel Appointed

<u>*CERTIFICATE OF SERVICE*</u>

I HEREBY CERTIFY that a copy of the foregoing was served upon:

Sean P. Murphy
Assistant United States Attorney
Torre Chardon, Ste 1201
350 Carlos Chardon Ave
San Juan, PR 00918
Sean.murphy@usdoj.gov

by electronically filing the foregoing with the Clerk of Court using the CM/ECF system and by email notification to Assistant United States Attorney Sean Murphy.

Respectfully submitted this 5th day of July, 2023.

/s/ Leza Lee Driscoll
LEZA LEE DRISCOLL
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: Leza_Driscoll@fd.org
N.C. State Bar No. 20926
LR 57.1 Counsel Appointed


/s/ Rosemary Godwin
ROSEMARY GODWIN
Assistant Federal Public Defender
Attorney for Defendant
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
E-mail: rosemary_godwin@fd.org
N.C. State Bar No. 18217
LR 57.1 Counsel Appointed